UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED
MAR 29 2002
Clerk, U.S. District Court
District of Columbia

| | | | |
|---|---|---|---|
| AIR LINE PILOTS ASSOCIATION, INTERNATIONAL *et al.*, | : | | |
| Plaintiffs, | : | | |
| v. | : | Civil Action No.: | 00-3113 (RMU) |
| PENSION BENEFIT GUARANTY CORPORATION *et al.*, | : | Document Nos.: | 11, 12, 20, 27 |
| Defendants. | : | | |

<u>**MEMORANDUM OPINION**</u>

GRANTING THE DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT;
DENYING THE PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

This case arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*. The plaintiffs, Air Line Pilots Association, International ("ALPA") and two individual pilots seek an injunction to stop the termination of Trans World Airlines's ("TWA") retirement plan for pilots. In addition, the plaintiffs request damages for losses suffered if the plan is terminated without following the requirements of ERISA. The defendants, Pension Benefit Guaranty Corporation ("the PBGC"), Pichin Corporation, and Icahn Associates Corporation, have filed motions to dismiss the case or, in the alternative, motions for summary judgment. The plaintiffs respond with an opposition as well as a cross-motion for summary judgment. After careful consideration of the parties' submissions, the relevant law, and the entire record herein, the court grants the defendants' motions for summary judgment and denies the plaintiffs' cross-motion for summary judgment.



## II. BACKGROUND

This case has a long and complex background, involving technical elements of bankruptcy, corporate, tax, and pension-benefits law. The main focus of the case, however, centers on the PBGC's termination of TWA's Pilot's Pension Plan under ERISA's termination provisions.

### A. Statutory Framework

### 1. The Employee Retirement Income Security Act of 1974

Following a 10-year study of the nation's private pension plans, Congress enacted ERISA in 1974. *See* 29 U.S.C. § 1001 *et seq*. ERISA is a comprehensive statute designed to protect the "well-being and security of millions of employees and their dependents [who] are directly affected by these plans." 29 U.S.C. § 1001(a). Long and technically complicated, the ERISA statute is divided into four major titles.

Title I of ERISA requires every administrator of a pension plan covered by ERISA to file periodic reports with the Secretary of Labor. *See* 29 U.S.C. § 1001 *et seq.*; *Nachman Corp. v. PBGC*, 446 U.S. 359, 362, n.1 (1980). In addition, Title I provides for both civil and criminal enforcement of the Act. *See id.* Title II amended the Internal Revenue Code, giving special tax treatment to covered plans to conform to the requirements of Title I. *See id.* Title III provided coordinated enforcement efforts among several federal departments as well as further study of the field of pension benefits. *See* 29 U.S.C. § 1201 *et seq.*; *Nachman*, 446 U.S. at 362, n.1. Finally, and most importantly for purposes of this case, Title IV established the Pension Benefit Guaranty Board. *See* 29 U.S.C. § 1301 *et seq.*; *Nachman*, 446 U.S. at 362, n.1. Title IV also created a termination insurance program specifically designed to protect employees against the

2

loss of benefits in the event of termination or insufficient funds to pay in full promised pension benefits. *See* 29 U.S.C. § 1301 *et seq.*; *Nachman*, 446 U.S. at 362, n.1.

### 2. The Pension Benefit Guaranty Corporation

The PBGC is a corporation wholly owned by the United States Government, modeled after the Federal Deposit Insurance Company. *See* 29 U.S.C. § 1302 (1994); *PBGC v. LTV Corp.*, 496 U.S. 633, 636-37 (1990). The PBGC administers and enforces Title IV of ERISA. *See* 29 U.S.C. § 1302(d). The PBGC operates a mandatory government insurance program that protects the pension benefits of millions of American workers who participate in pensions covered by ERISA. *See LTV Corp.*, 496 U.S. at 637. To comply with its statutory mandate, the PBGC's board of directors includes the Secretaries of Treasury, Labor, and Commerce. *See id.*

The PBGC can carry out its statutory obligations in a variety of ways. Perhaps the simplest and most common situation occurs when the PBGC terminates a pension fund because the fund has insufficient assets to satisfy its obligations to the retired employees. In this situation, the PBGC "becomes the trustee of the plan, taking over the plan's assets and liabilities." *Id.* The PBGC then combines the remaining assets of the terminated plan with its own funds to "ensure payment of most of the remaining 'non-forfeitable' benefits."[1] *See* 29 U.S.C. §§ 1301(a)(8), 1322(a)–(b); *LTV Corp.*, 496 U.S. at 638. The PBGC then pays benefits according to limits defined by the ERISA statutes. *See* 29 U.S.C. § 1322(b)(3)(B). These limits apply to all benefits paid by the PBGC even if the employees were entitled to greater benefits under their private plans. *See id.*

The PBGC is funded in two ways. The first is through employers who operate and maintain pension plans covered by ERISA. These employers are required to pay annual

---

[1] The ERISA statute defines a non-forfeitable benefit as "a benefit for which a participant has satisfied the conditions for entitlement under the plan or the requirements of this chapter . . . ." 29 U.S.C. § 1301(a)(8).

3

premiums for the insurance. *See* 29 U.S.C. §§ 1306-07. In addition to these mandatory premiums, the PBGC receives funds from a statutory liability "imposed on employers who terminate underfunded pension plans." *See LTV Corp.*, 496 U.S. at 638. When a plan is terminated, the employer becomes liable to the PBGC for the amount of benefits to be paid out. Historically, however, the PBGC has received a very small portion of these liability payments, and Congress has been forced to raise the annual premiums as a means to allow the PBGC to continue functioning. *See id.*

The PBGC has the authority to conduct both voluntary and involuntary terminations. *See* 29 U.S.C. §§ 1341-42. Voluntary terminations can take two forms. First, a "standard termination" occurs when the employer has sufficient assets to pay all the benefit commitments of a terminated plan. *See id.* at 639. The second form of voluntary termination occurs when the company does not have sufficient funds to pay its obligations to the employees. Under this latter form of termination, the employer must demonstrate financial distress to the PBGC. *See* 29 U.S.C. § 1341(c).

Involuntary terminations occur pursuant to Section 4042 of ERISA. *See* ERISA § 4042; 29 U.S.C. § 1342. The PBGC may involuntarily terminate a private pension if it determines that any of the following four factors are present:

> (1) the plan has not met the minimum funding standard required . . . [by the statute], (2) the plan will be unable to pay benefits when due, (3) the reportable event described in section 1343(b)(7) of [ERISA] has occurred, or (4) the possible long-run loss of the corporation with respect to the plan may reasonably be expected to increase unreasonably if the plan is not terminated.

29 U.S.C. § 1342(a); *see also LTV Corp.*, 496 U.S. at 639.

4

## B. Factual History

The instant dispute arises from actions taken by all parties in 1992 when TWA filed for bankruptcy in the United States District Court for the District of Delaware.

### 1. The TWA Bankruptcy

On January 31, 1992, TWA filed for Chapter 11 Bankruptcy in the Bankruptcy Court for the United States District Court for the District of Delaware. *See* Defs. Icahn and Pichin's Mot. to Dismiss or for Summ. J. ("Defs.' Mot.") at 3. Shortly after the bankruptcy filing, the PBGC notified the court and the parties that TWA's pension plans, including the Pilot's Plan, were $1.124 billion underfunded. *See id.* The PBGC also indicated that because of the severe nature of the underfunding, it intended to terminate the pension funds pursuant to its statutory authority. *See id.* In addition to terminating the pension funds, the PBGC also expressed its intention to pursue TWA and its chairman, Carl C. Icahn, for the $1.124 billion in ERISA liability. *See id.* at 3 n.2. The underfunded pensions and the potential liability associated with them became a large obstacle that "jeopardized any successful reorganization" of TWA.[2] *See id.* at 4. According to the defendants, only Carl Icahn was willing to provide TWA with the $200 million in capital it needed to reorganize. *See id.* at 6. In return, however, Mr. Icahn demanded that his liability relating to the underfunded pensions be dramatically reduced. *See id.*

---

[2] The main reason for the obstruction was the conflicting interests of the parties affected by the pension funds. First, the PBGC's interest centered on implementing its statutory authority to protect the benefits owed to the workers. *See* Defs.' Mot. at 4. Second, the pilots' union had an interest given that ERISA imposes statutory maximums on the amount of benefits payable to employees. *See id.* at 5. Because of these limits, it became apparent that allowing the plan to be terminated and turned over to the PBGC would result in a substantial reduction in many pilots' benefits. *See id.* Finally, TWA had a strong interest in resolving this matter. *See id.* According to the defendants, the claim by the PBGC made it impossible for TWA to raise the necessary additional capital that it needed to successfully reorganize and continue to operate. *See id.*

## 2. The Comprehensive Settlement Agreement

Faced with a stalemate, the parties – TWA, Carl Icahn, the PBGC, and the respective unions (including the ALPA, the union that represented more than 1,500 active TWA pilots, which played an intricate role) – resolved the dispute by signing a Comprehensive Settlement Agreement ("the CSA") on January 5, 1993. *See* Defs.' Mot. at 6; 1st Am. Compl. at 2-3. Dense and complex, the CSA became the centerpiece of the TWA reorganization plan. *See* Defs.' Mot. at 6. With respect to this case, the agreement contains the following relevant provisions:

> (1) Carl Icahn would loan TWA $200 million; (2) An Icahn entity (Pichin, a named defendant in this suit) would sponsor the pension plans instead of TWA. Thus, Icahn became responsible for making the minimum funding contributions and TWA was released from all liability for the plans; (3) TWA was to issue $300 million in notes to make part of the annual pension plan contributions in compliance with ERISA and provisions of the Internal Revenue Code; (4) PBGC would not terminate the plans and would release TWA and Icahn from all future termination liability, except for what was agreed to in the CSA; (5) PBGC would, at Icahn's request, terminate the plans if a ***"Significant Event,"*** as defined in the CSA, occurred and; (6) that in the event of a Significant Event requiring termination, Icahn's liability to PBGC would be limited to $240 million to be made in eight annual payments of $30 million each.

CSA (emphasis added); *see also* Defs.' Mot. at 9. All the parties, including the plaintiffs, signed this agreement and the bankruptcy court approved it on December 30, 1992. *See* Def.'s. Mot. at 8.

## 3. Termination of the Pilot's Pension Plan

On December 10, 2000, Pichin Corporation, the Icahn subsidiary authorized to oversee the pension plans, gave notice to the PBGC that a "Significant Event," as defined in the CSA, occurred and requested termination of the Pilot's Pension Plan effective January 1, 2001. *See* Pls.' Opp'n to Defs.' Mot. ("Pls.' Opp'n") at 9; Defs.' Mot. at 2. According to the termination request, Pichin was asserting its rights under section 10(j) of the CSA. *See* CSA § 10(j). Defining a "significant event" for purposes of the CSA, section 10(j) reads as follows:

6

> Failure of the Icahn Holding Corporation and the other members of the group filing a consolidated federal income tax return with it, to receive, prior to May 1, 1993, favorable rulings, or equivalent closing agreements, in substantially the form requested in its January 4, 1993 submission to the Internal Revenue Service ("IRS"), or notification by the IRS that it does not intend to issue such favorable rulings or equivalent closing agreements; *provided that* the Plans cannot be terminated by virtue of this Significant Event prior to January 1, 1995.

CSA § 10(j) at 44; *see also* Pls.' Opp'n at 9; PBGC's Mot. to Dismiss ("PBGC's Mot.") at 14.

After the Pichin Corporation made its written request, the PBGC determined that the Pichin Corporation had satisfied its obligations under the CSA and, thus, that the PBGC was obligated to terminate the plans. *See* PBGC's Mot. at 14. Pursuant to the CSA and 29 U.S.C. § 1342(c), the PBGC, Pichin, and TWA signed an agreement dated January 2, 2001, which terminated the pension plans. *See id.* In addition, in accordance with 29 U.S.C. § 1342(d), the agreement appointed the PBGC as the statutory trustee. *See id.*

### C. Procedural History

The defendants agree that the significant event did in fact occur since the IRS did not issue a ruling favorable to Icahn companies as set forth in the CSA. *See* PBGC's Mot. at 14; Defs.' Mot. at 10. While the plaintiffs do not explicitly dispute this point, they initiated the instant action on December 29, 2000, asserting that the PBGC, Pichin Corporation, and Icahn Associates Corporation terminated the pension plan without following the "strict requirements" set forth by ERISA in 29 U.S.C. § 1342(a). *See* 1st Am. Compl. ("Compl.") at 4. The plaintiffs assert that the PBGC's decision to "terminate the plan without satisfying the requirements of ERISA is arbitrary and capricious, and a violation of ERISA." *Id.* at 5. In their complaint, the plaintiffs request injunctive relief to prohibit the termination of the plan until ERISA has been satisfied or, if termination has already occurred, as is the case, restoration of the plan in accordance with 29 U.S.C. § 1347. *See id.* at 2, 6. In addition, the plaintiffs request that the

7

court order monetary damages against Pichin Corporation and Icahn Associates Corporation for any damages suffered as a result of the plan's termination before the satisfaction of ERISA's requirements. *See id.* at 2, 6.

On March 20, 2001, defendants Pichin Corporation and Icahn Associates Corporation filed a motion to dismiss or, in the alternative, for summary judgment pursuant to Federal Rules of Civil Procedure 12(b)(6) and 56(c). *See* Defs.' Mot. at 1. In their motion for summary judgment, the defendant corporations asserted several equitable defenses[3] and also argued that there is no legal basis for money damages under ERISA, and that the plaintiffs had failed to plead a cause of action for plan restoration. *See id.* at 2.

Also on March 20, 2001, defendant PBGC filed a separate motion to dismiss the plaintiffs' action. *See* PBGC's Mot. at 1. In their motion, the PBGC argues that the plaintiffs' claims amount to a collateral attack on the CSA and judicial relief from a "bad deal." *See id.* at 2. The PBGC also argues that res judicata bars the plaintiffs' claims. *See id.* at 15. In addition, the PBGC maintains that neither the signing of the CSA nor the termination of the pension funds violated ERISA. *See id.* at 22.

### III. ANALYSIS

#### A. The Court Treats the Defendants' Motions as Motions for Summary Judgment

In this case, defendants Pichin Corporation and Icahn Associates Corporation filed a motion to dismiss or, in the alternative, for summary judgment. *See* Defs.' Mot. at 1. The defendants attached to this motion numerous documents for the court's review. Pursuant to the

---

[3] The equitable defenses asserted by defendants Pichin Corporation and Icahn Associates Corporation are: (1) laches and waiver, because the pilots approved the CSA in 1992 and the corporations relied to their detriment on it; (2) estoppel, because the pilots accepted the benefits of the CSA; and (3) the doctrine of equitable mootness, because the specific relief sought by the plaintiffs would disrupt TWA's 1993 Reorganization Plan. *See* Defs.' Mot. ¶ 2(a)-(c).

8

Federal Rules of Civil Procedure, the course of action for a court, when materials outside the complaint are considered, is to convert the motion to dismiss to a motion for summary judgment. *See* FED. R. CIV. P. 12(b), 56; *Tele-Communications of Key-West, Inc. v. United States*, 757 F.2d 1330, 1334 (D.C. Cir. 1985) (citing *Carter v. Stanton*, 405 U.S. 669 (1972)). Rule 12(b) specifically states that if "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided for in Rule 56 . . . ." FED. R. CIV. P. 12(b). There are, however, constraints on the court's authority to covert a motion to dismiss to a motion for summary judgment. Rule 12(b) also provides that when a court elects to convert the motion "all parties shall be given reasonable opportunity to present all materials made pertinent to such a motion by Rule 56." *Id.; see also Hollis v. United States Dep't of the Army*, 856 F.2d 1541, 1543 (D.C. Cir. 1988); *Tele-Communications of Key-West*, 757 F.2d at 1344.

In this case, all the requirements of the Federal Rules were met. On February 22, 2001, the court granted the defendants an extension of time to file their initial motion. *See* Order dated February 22, 2001. The court also granted the plaintiffs an additional six weeks to prepare and file an appropriate response. *See* Order dated March 30, 2001. On May 17, 2001, the plaintiffs filed a response to the defendants' motion for summary judgment and included with that filing their own motion for summary judgment. *See* Pls.' Opp'n at 1. Thus, pursuant to Federal Rule of Civil Procedure 12(b)(6), the court converts the motion to dismiss to a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(c).

### B. Legal Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

9

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995). To determine which facts are "material," a court must look to the substantive law on which each claim rests. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *See Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *See Anderson*, 477 U.S. at 255. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *See id.* at 252. To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *See Celotex*, 477 U.S. at 322. By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment. *See id.*

In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *See Greene*, 164 F.3d at 675. If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted). In the instant case, the court

concludes that there are no material facts at issue, and that the case is ripe for summary judgment.

### C. Equitable Defenses

In their respective motions, the defendants raise a number of equitable defenses seeking to prevent the plaintiffs' claims from moving forward. *See* Defs.' Mot. ¶¶ 1-2; PBGC's Mot. at 15. For these defenses to apply in this case, the court first must conclude that the plaintiffs' claim amounts to nothing more than a collateral attack on the provisions of the CSA executed in 1993. According to the plaintiffs, this is a mischaracterization of their claims. *See* Pls.' Opp'n at 2. The plaintiffs assert that their claims "challenge the PBGC's action under Title IV of ERISA and maintain that the CSA is consistent with Title IV of ERISA and, in any event, could not be enforced if it were not so consistent." *Id.* After a thorough review of the claims presented, the court concurs with the plaintiffs' assessment of their claims. The question properly before the court is whether the PBGC, in abiding by the CSA, has in any way violated the statutory-termination provisions of ERISA. In light of this observation, the court need not address any of the equitable defenses asserted by the parties, and therefore can proceed with an analysis of the CSA and its relation to the ERISA guidelines.

### D. The PBGC's Termination of the Pilot's Pension Plan Did Not Violate ERISA

The plaintiffs advance a four-part argument relating to the termination procedures in this case. Each part requires the court to make certain conclusions of law before proceeding to the next part. In the final analysis, the court rules in favor of the defendants on the plaintiffs' principal contentions.

First, the plaintiffs contend that the termination provisions of Title IV of ERISA are exclusive and that authorization for the PBGC to terminate a pension plan cannot be derived

11

from any other source. *See* Pls.' Opp'n at 10. Second, the plaintiffs assert that because the provisions of Title IV of ERISA are exclusive, the CSA's section 10 cannot, as a matter of law, provide authorization for the PBGC to terminate the plan without complying with ERISA. *See id.* at 11. Third, the plaintiffs claim that under Title IV of ERISA, the PBGC must make a cause determination, pursuant to ERISA § 4042(a), before it can proceed with a plan termination and that, in this case, the PBGC made no such determination. *See id.* at 12-15. Finally, the plaintiffs argue that even if the court concludes that the PBGC made an implicit cause determination in 1992, it would be arbitrary and capricious for the termination to be based on what is now a 10-year-old cause determination. *See id.* at 16.

### 1. Termination Procedures are Exclusive Under ERISA

Taking the plaintiffs' assertions in logical order, the court must first examine Title IV of ERISA. Title 29 U.S.C. § 1341(a)(1), which begins Title IV of ERISA, states that "a single-employer plan may be terminated *only* in a standard termination under subsection (b) of this section or a distress termination under subsection (c) of this section." 29 U.S.C. § 1341(a)(1) (emphasis added). The plain language used by Congress, with the unambiguous term "only," evidences a clear intent that the termination procedures established in Title IV are exclusive. In addition, the legislative history is also instructive on this point. As the Fifth Circuit has observed, "Congress intended this mechanism to 'provide the sole and exclusive means under which a qualified pension plan may be terminated.'" *Matter of Esco Mfg. Co.*, 50 F.3d 315, 316 (5th Cir. 1995) (quoting H.R. Rep. No. 300, 99th Cong., 2d Sess. 289 (1985), reprinted in 1986 U.S.C.C.A.N. 42, 756, 940). Other circuits have also spoken on the exclusivity of the provisions of Title IV of ERISA, holding that "[t]he statutory provisions governing terminations of single-employer plans are exclusive." *See PBGC v. Mize Co.*, 987 F.2d 1059, 1063 (4th Cir. 1993); *see*

12

*also In re Pension Plan for Employees of Broadway Maint. Corp.*, 707 F.2d 647, 648 (2d Cir. 1983).

This combination of plain language, legislative history, and case law demonstrates that the plaintiffs' assertion regarding the exclusivity of Title IV of ERISA is correct. In addition, the defendants never contest this specific point in their motions. For all these reasons, the court agrees that Title IV's termination procedures are exclusive.

### 2. Section 10 of the CSA Does Not Violate ERISA

The court now turns to the plaintiffs' second contention, namely, that the CSA's section 10 does not authorize the PBGC to terminate the plan without complying with ERISA. *See* Pls.' Opp'n at 11. In this argument, the plaintiffs contend that as a matter of interpretation, section 10 cannot be the authority for termination. *See id.* Rather, termination authority must stem from the exclusive provisions of Title IV of ERISA. *See id.* Hence, the question for the court to consider is whether section 10 of the CSA violates Title IV of ERISA by providing independent termination authority.

In answering this question, the PBGC offers a different interpretation of section 10. The PBGC contends that section 10 of the CSA is simply

> an agreement between PBGC, the plan administrators [Pichin, Icahn and TWA], as well as ALPA, to terminate the Pilot's Plan, at a time when the statutory criteria were met, with a delayed implementation based on the agency's forbearance and agreement to contractual terms that governed the timing of plan termination.

PBGC's Mot. at 24. Under the PBGC's interpretation, section 10 does not serve as the basis for termination authority and thus does not violate ERISA. *See id.* (citing 29 U.S.C. § 1348(a)(3)).

On its face, nothing in section 10 of the CSA violates the provisions of ERISA. Section 10 is carefully worded so as to incorporate references to the ERISA statute. For example, the

13

first paragraph of section 10 states, "the Plans *shall*, at the request of the Icahn Sponsor [Pichin], be terminated under ERISA § 4042 . . . after (i) the occurrence of a Significant Event as defined herein and (ii) a written request for termination of all of the Plans by the Icahn Sponsor . . . ." CSA § 10 at 39 (emphasis added). Furthermore, as defendants Pichin Corporation and Icahn Associates Corporation correctly point out, section 10 remains consistent with its references to ERISA's termination procedures. Specifically, section 10 states, "the Plans *will be* terminated under ERISA § 4042 on the date provided for in this [s]ection . . . unless the PBGC notifies the Icahn Sponsor [Pichin] and TWA, within five Business Days of the request for termination by the Icahn Sponsor, that termination *must be* pursuant to § 4041(c)." *Id.* at 41 (emphasis added). The use of the phrases "shall," "will be," and "must be," all of which precede direct citations to ERISA, demonstrate a clear intent by the authors of section 10 to fully comply with the statutory requirements of ERISA.

The plaintiffs appear to argue two main points here. First, they contend that section 10 provides additional authority outside of ERISA to terminate the pension plans. Second, the plaintiffs assert that section 10 requires the PBGC to start from square one of its termination procedures. These contentions are based on an erroneous reading of section 10 and its requirements. Even in light of section 10, the PBGC's authority to terminate the Pilot's Plan stems entirely from Title IV of ERISA. *See* 29 U.S.C. § 1341. The plaintiffs cite to no language in section 10 that requires the court to reach a different conclusion. All section 10 does is place conditions on the PBGC's ability to exercise its authority under the ERISA statute.

Additionally, for the plaintiffs' argument to succeed, the court would have to read section 10 so narrowly as to render the CSA a meaningless document.[4] If the PBGC had to start from the beginning and go back through all the requirements of the determination pursuant to 29 U.S.C. § 1341 to terminate the plans, the entire purpose of the CSA would become questionable. According to the plaintiffs' reading of section 10, it is more plausible that the PBGC simply would have agreed not to terminate the plans in 1992 and the reorganization plans of TWA would not have been impeded. This was not the case. *See* Defs.' Mot. at 4; PBGC's Mot. at 6-7; Pls.' Opp'n at 5. As all parties acknowledge, the PBGC intended to terminate the underfunded plans in 1992. *See* PBGC's Mot. at 5; Defs.' Mot. at 4; Pls.' Opp'n at 6. The creation of the CSA, however, prevented the PBGC from taking this action.

Contrary to the plaintiffs' contention, the cornerstone of the CSA was the understanding that termination by the PBGC would only occur after a significant event and subsequent written request. Any other reading of section 10 is improper and lacks factual support or logical basis. Thus, while the court agrees with the plaintiffs that, as a matter of law, section 10 does not provide the authority for the PBGC to terminate the plans in contravention of ERISA, the court does not agree with the plaintiffs' contention that section 10 contravenes ERISA. Rather, the court holds that section 10 is completely compatible with ERISA's termination procedures and, therefore, actions taken by the PBGC pursuant to section 10 complied with ERISA. Accordingly, on this point, the court concludes that there is no genuine issue as to a material fact and that the defendants are entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Celotex Corp.*, 477 U.S. at 322.

---

[4] It is a well-established principle that when interpreting statutes or contractual provisions, a court should "absent a clear indication to the contrary, . . . read the statute [or provision] so that no word, clause, sentence, or phrase is rendered surplusage, superfluous, meaningless or nugatory." Norman J. Singer, Sutherland Stat. Const. § 46.03.

15

### 3. The PBGC Made a Proper Cause Determination Under § 4042(a) of ERISA

Next, the plaintiffs ask this court to conclude that the PBGC failed to make a cause determination under ERISA § 4042(a) and that this failure contravenes ERISA and entitles the plaintiffs to judgment as a matter of law. *See* Pls.' Opp'n at 12-16 (citing 29 U.S.C. § 1342(a)). The plaintiffs contend that ERISA unambiguously and without exception requires a cause determination under § 4042(a). Section 4042(a) reads, in pertinent part:

> The corporation [PBGC] may institute proceedings under this section to terminate a plan whenever it determines that–
>
> (1)  the plan has not met the minimum funding standard required under section 412 of Title 26, or has been notified by the Secretary of the Treasury that a notice of deficiency under section 6212 of Title 26 has been mailed with respect to the tax imposed under section 4917(a) of Title 26,
> (2)  the plan will be unable to pay benefits when due,
> (3)  the reportable event described in section 1343(c)(7) of this title has occurred, or
> (4)  the possible long-run loss of the corporation [PBGC] with respect to the plan may reasonably be expected to increase unreasonably if the plan is not terminated.

29 U.S.C. § 1342(a). In addition to the plain language of the statute, courts have held that these requirements create a condition precedent for terminating a plan. *See PBGC v. Heppenstall Co.*, 633 F.2d 293, 296-97 (3d Cir. 1980) (holding that the PBGC may institute termination procedures "whenever it determines that certain events have transpired"); *Addison v. United Airlines, Inc.*, 1988 WL 9100, *3 (N.D. Ill. 1988) (holding that "[w]hen these criteria [section 4042] are absent, the only other statutory method for initiating plan termination is the voluntary termination procedures set forth in 29 U.S.C. 1341(a)"). This line of authority, however, does not address the precise situation facing the court in this case.

This dispute centers on the existence of an intervening agreement, the CSA, which provides for termination of the pension plans under specific conditions. *See* CSA § 10. The

reason that the CSA exists at all is because of the parties' negotiations during TWA's initial bankruptcy proceeding in 1992. *See* PBGC's Mot. at 9; Defs.' Mot. at 6; Pls.' Opp'n at 5. The parties do not disagree that TWA's pension plans were $1.124 billion underfunded in 1992, thus triggering cause for termination under ERISA § 4042(a)(4), codified at 29 U.S.C. 1342(a)(4). *See* PBGC's Mot. at 6; Defs.' Mot. at 3; Pls.' Opp'n at 6. Given the situation in 1992, the PBGC determined that its long-run liability was going to increase unreasonably because of the potential breakup of the TWA-controlled group, thereby creating grounds for termination. *See* PBGC's Mot. at 24.

The defendants contend – and the court agrees – that the CSA merely delayed the inevitable termination of the Pilot's Plan, and left the timing of the termination up to Pichin, "based on the occurrence of one or more of the Significant Events." *See id.* at 24. In light of the court's ruling that the CSA does not violate ERISA, the court concludes that the defendants did not violate ERISA because the cause determination made in 1992 pursuant to § 4042(a)(4) was the underlying reason for the PBGC's involvement in the CSA.

### 4. The PBGC's Actions Were Neither Arbitrary Nor Capricious

The plaintiffs' final argument is that even assuming *arguendo* that the PBGC did make a cause determination in 1992, the PBGC acted arbitrarily and capriciously in terminating a plan in 2001 on the basis of a cause determination made in 1992. *See* Pls.' Opp'n at 16-18. The Supreme Court has applied the arbitrary and capricious standard to the PBGC's decisions in previous cases. *See, e.g., LTV Corp.*, 496 U.S. at 656. Under this standard, the court must consider whether the PBGC based its determination on a consideration of the relevant factors and whether there has been a clear error of judgment. *See PBGC v. FEL Corp.*, 798 F. Supp. 239, 241 (D.N.J. 1992).

17

In advancing their argument, the plaintiffs contend that "PBGC's failure to consider the current state of the Plan compels a finding that the PBGC acted arbitrarily and capriciously when it made the termination decision." Pls.' Opp'n at 18. The plaintiffs assert that the case is analogous to *Hess v. Hartford Life and Accident Insurance Co.*, in which the court held that "Hartford [Life and Accident Insurance Company] based its decision regarding Hess' compensation on misinformation, which led it to reach a decision as to her benefits that was arbitrary and capricious." 91 F. Supp.2d 1215, 1222 (C.D. Ill. 2000). In contrast, the PBGC analogizes this case to *FEL Corp.*, in which the district court held that when the PBGC based its termination on ERISA § 4042(a)(4), its determination was not arbitrary and capricious and therefore should not be disturbed by the court. *See FEL*, 798 F. Supp. at 242.

In determining whether the PBGC acted in an arbitrary and capricious manner in this case, the court notes that there exists little, if any, case law directly on point. The court, however, deems the defendants' analogy to *PBGC v. FEL Corp.* far more persuasive than the plaintiffs' analogy. In *Hess*, the dispute revolved around the issue of which agreement between the parties defined the benefits for outside loan officers. *See Hess*, 91 F. Supp.2d at 1218. But the PBGC was not involved in the case nor were there any termination proceedings. *See id.* The case did involve the interpretation of contracts between employer and employee with respect to benefits, but the similarities end there. In contrast, in *FEL Corp.*, the PBGC made the same "long-run" determination with respect to the FEL Corporation that it made with respect to TWA pursuant to 29 U.S.C. § 1342(a)(4). *See FEL Corp.*, 789 F. Supp. at 241. In *FEL Corp.*, the FEL Corporation was a member of a larger control group that included a corporation known as Harvard Industries, Inc. *See id.* at 240-41. When Harvard filed for Chapter 11 bankruptcy, the PBGC expressed concern that, because of the potential breakup of the control group, the

18

"possible long-run loss of the PBGC with respect to the plans may reasonably be expected to increase unreasonably if the plans were not terminated." *See id.* at 241.

This is almost exactly the same fear that the PBGC had when TWA filed for Chapter 11 bankruptcy in 1992. *See* PBGC's Mot. at 22. The only difference between the two situations is that in *FEL Corp.*, the PBGC chose to terminate the plans, while in this case, the PBGC negotiated with the parties to form the CSA. *See id.* at 22; *FEL Corp.*, 798 F. Supp. at 241. In *FEL Corp.*, the PBGC concluded, "that if the plans are not terminated now, they will likely be terminated in the future." *FEL Corp.*, 798 F. Supp. at 241. In reaching that conclusion, the PBGC relied on the FEL Corporation's financial condition including the corporation's net worth, real estate holdings and outstanding loan obligations. *See id.* The court deemed the PBGC's determination reasonable and not arbitrary and capricious. *See id.* Similarly, in this case, TWA's financial condition was bleak and the liability for the pension plans exceeded $1 billion, the full brunt of which would have been borne by the PBGC. *See* PBGC's Mot. at 22. Moreover, because of the complex nature of Icahn's business holdings, the PBGC's ability to recover the liability was uncertain at best. *See id.* Since the plaintiffs have offered no evidence of a change in the financial status of TWA, Pichin Corporation, or Icahn Associates Corporation, the court has no reason to assume that these conditions have changed in such a dramatic fashion as to render the PBGC's termination decision arbitrary and capricious. Accordingly, the court holds that, on this point as well, the plaintiffs have failed to demonstrate any "genuine issue as to any material fact" and, therefore, the defendants are entitled to a judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *see also Celotex Corp.*, 477 U.S. at 322. The court grants the defendants' motion for summary judgment and denies the plaintiffs' cross-motion for summary judgment.

Because of the court's ruling, the court need not address the claims raised by the plaintiffs concerning money damages under ERISA. Since the termination was lawful under ERISA, the plaintiffs suffered no money damages. Lastly, the court denies the plaintiffs' motion for oral argument.

## IV. CONCLUSION

For all these reasons, the court grants the defendants' motions for summary judgment and denies the plaintiffs' cross-motion for summary judgment. An order directing the parties in a manner consistent with this Memorandum Opinion is separately and contemporaneously issued this 29 day of March, 2002.

Ricardo M. Urbina
United States District Judge